James Castle, Plaintiff-Appellant, *v.* Norman E. Hulcher, Individually, and d/b/a Norman Hulcher Quarry, and Hulcher Quarry, Inc., Defendants-Appellees.

(No. 72-349;

Fifth District—June 10, 1974.

12

EBERSPACHER, J., dissenting.

Bullington & White, of Hillsboro, and Sweeney & Sweeney, of Taylorville, for appellant.

Stuart Dobbs, of Denby & Dobbs, of Carlinville, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

This is an action for a declaratory judgment and other relief brought by the plaintiff-appellant against the defendant-appellee. Relief was denied and plaintiff appeals.

In June 1965 Mr. C. H. Johnson signed an agreement with the plaintiff-appellant, James Castle, which authorized the latter "* * * as my agent to negotiate for the sale or lease of my quarry operations * * *." Acting on this authorization, Castle contacted defendant-appellee Hulcher, and on October 16, 1965, plaintiff-appellant, James Castle, and defendant-appellee Norman E. Hulcher signed as lessees a contract with Charles H. Johnson for the operation of the quarry owned by the latter. The lease was for 15 years with a renewal privilege. Limestone, roadrock, gravel and sand were to be mined and sold, the lessees to pay a 10-cents-per-ton royalty to the owner.

Paragraph 12 of the lease provided that "It is mutually agreed by all parties to this lease and contract that in the event the said Norman E. Hulcher desires to form and establish or does form and establish a corporation, the purposes of which said corporation includes the production and mining of limestone, roadrock, sand or gravel and the purposes

of this lease and contract as are herein specified that this lease and contract will be sold, assigned, or transferred to the corporation at any time requested in writing by said Norman E. Hulcher."

Following the signing of the lease, Hulcher put in pumps to reduce the water level in the quarry. He asked Castle to find a contractor who would come in and operate the quarry. Castle found a contractor, Lyle Moushon, who operated the quarry at a loss for a year, producing about 60,000 tons. This was approximately one-half enough to meet royalty payments since the lessees were obligated to the owner to pay 10 cents per ton or a minimum of $6,000 each 6 months. Hulcher made these payments. The contract with Moushon, which had been only between Hulcher and Moushon, was terminated and Castle was asked to find another crusher. He found Kessen and a contract was signed with him, this time by both lessees. Kessen's production was not much better than that of Moushon and his relationship was terminated in February 1968. Hulcher made the minimum royalty payments. Hulcher then moved in his own machinery and equipment and commenced crushing in May or June of 1968. Following this, production expanded and the quarry became a paying operation.

On March 24, 1970, acting in accordance with paragraph 12 of the lease, Hulcher assigned "any and all rights granted under a contract dated October 16, 1965 between Charles H. Johnson and the aforesaid Norman E. Hulcher and James Castle to Hulcher Quarry, Inc., an Illinois corporation." Hulcher subscribed his name to this assignment.

For approximately 4 years following the signing of the lease, Castle devoted some time to the quarry—operating the scales and keeping trucking records. Also, he purchased trucks of his own with some financial assistance from Hulcher and during this same period of time operated an independent trucking business, hauling materials from the quarry. On March 14, 1969, Hulcher became angry at Castle because the latter was using Hulcher's mechanics to repair his own trucks, and Castle was told to take his trucks and get out and not come back. Two years later, in February 1971, Castle filed his complaint for a declaratory judgment claiming that he was a co-lessee entitled to 50% of the profits from the operation and asking for an accounting.

Castle contends that he is a co-lessee and in the absence of a specification of the interests of the lessees is entitled to one-half of the profits; that Hulcher's admission that the lease contract was executed by the owner, Castle, and himself is a judicial admission, and that he therefore cannot deny the effect of the lease as stated above. Also, Castle claims that he received no notice or consideration at the time Hulcher transferred the ·

interests under the lease to the corporation and that therefore Castle's interest in the lease was not divested. Castle further states that over a period of 4 years he contributed a substantial amount of work to the quarry enterprise for which he has not been compensated.

Hulcher maintains, on the other hand, that there was never any intent that Castle be in fact regarded as a co-lessee, that this arrangement was made as a method of paying him for finding a lessee of the quarry for the owner. The evidence corroborates Hulcher's declarations that Castle invested nothing in the enterprise, that all of the operating capital and expenses of operation were paid by Hulcher, that Hulcher alone dealt with Johnson in paying royalties and in discussing matters that arose under the lease. Hulcher maintains that Castle was to receive 2 cents per ton in lieu of a commission from Johnson for finding a lessee and that this was credited to Castle in the quarry accounts. He further maintains that Castle has been paid everything due him under agreements accepted by both of them during the 4-year period of operation and that Castle, in effect, approved Hulcher's transfer of leasehold interests to the corporation by raising no objections for a period of more than 1 year.

The primary issue in this case is whether or not Castle is entitled to share in the quarrying enterprise as a co-lessee.

What was the purpose in mind when Castle was named a co-lessee, and what do the statements and actions of the parties indicate his interest was intended to be? Castle maintains that these questions cannot be explored since Hulcher has made a judicial admission of the existence of the lease and its contents. We do not agree. There is no magic in a judicial admission. It is simply a way of saying that one should not be permitted to refute something which it can be proved he has admitted. In this case Hulcher admitted the existence and the language of the lease. Beyond that he admitted nothing and it is obvious that substantial disagreement exists over the meaning of the lease. After all, the trial court did hear parol evidence from both parties regarding its meaning. None of the cases cited by Castle in support of his contention regarding a judicial admission involve the construction of an instrument. All are personal injury cases. In *Rosbottom v. Hensley*, 61 Ill.App.2d 198, 209 N.E.2d 655, the question was whether or not the plaintiff's statement to the defendant during a hospital visit that it was an "accident which could have happened to anyone" was a judicial admission barring the plaintiff's suit. The court did not regard this as a judicial admission. It said that the word "accident" must be defined in the context in which it is used. In *Nowak v. Schrimpf*, 44 Ill.App.2d 309, 194 N.E.2d 547, the plaintiff admitted that a third car caused a truck to swerve into his path. This was regarded as a judicial admission and

rightly so. But we have here a simple statement, not a document to be interpreted. In *Huber v. Black & White Cab Co.*, 18 Ill.App.2d 186, 151 N.E.2d 641, the plaintiff stated that the defendant with whom he was riding was driving at a proper rate of speed and slowed down at the intersection. He was later barred from controverting this and rightly so. Here again we have a simple statement, not a document to be interpreted.

Can extrinsic evidence be admitted to show the interests of the parties in the lease? In *Sturdyvin v. Ward*, 336 Ill. 594, 168 N.E. 666, the court said that a conveyance to two or more parties without a designation of interest creates the presumption that they take equal shares as tenants in common, but that evidence is admissible to show otherwise. Such evidence was admitted in the *Sturdyvin* case to show that one of two signatories on a mortgage was only a surety. Cases cited by Castle to show that the law presumes that they take equal shares as co-lessees also recognize that this is a rebuttable presumption. In *Keuper v. Unknown Heirs of Mette*, 239 Ill. 586, 88 N.E. 218, a husband attempted to show that his wife was a partner in a business conducted by him and a deceased co-owner thus entitling them to two-thirds of the property instead of one-half upon the decease of the co-owner. The court refused to allow their claim because the evidence did not show that the wife was in fact a partner. In *Miller v. Mathias*, 145 Ill.App. 465, the question was whether or not a conversation between one lessee and the deceased lessor was admissible to show that rent had been paid. The court rightly held that such was not admissible. In *Shinn v. Shinn*, 91 Ill. 477, the court held that *so far as third parties are concerned* joint purchasers of a certificate of purchase at a foreclosure sale are regarded as having equal shares, thus inferring that as between the parties evidence may be admitted to show a different division. In *Porter v. Porter*, 381 Ill. 322, 45 N.E.2d 635, the court *did* interpret language in a deed and in a habendum clause to the deed to determine whether a conveyance created a tenancy in common, a joint tenancy, or a life estate.

■■ While we agree with Castle's statement that the court cannot establish a contract different from that expressed in the written agreement of the parties, this does not mean that extrinsic evidence cannot be introduced to show what the parties intended the contract to mean. In *Freeland v. Edwards*, 11 Ill.2d 395, 142 N.E.2d 701, cited by Castle, though the court states that "* * * we cannot establish a contract different from that expressed in the written agreement," it also says, "The primary object of construction is to give effect to the intention of the parties, greater regard being given to such intent, when clearly revealed, than to particular words or clauses of the contract." And in *Armstrong*

*Paint & Varnish Works v. Continental Can Co.,* 301 Ill. 102, 133 N.E. 711, the court states, "\* \* \* the real difficulty arises in determining in each case whether the language of the instrument is ambiguous, as shown either by the context *or by the circumstances attending the same.*" (Emphasis added.)

We have no hesitancy in stating that it is proper to consider the actions of the parties and other extrinsic evidence in determining the share or interest of Castle in the quarry operation. In 12 I.L.P. *Contracts* § 232 it is stated that "Regard will be had to the practical construction, if any, which the parties by their acts or conduct have given the contract." In *Vermont St. M.E. Church v. Brose,* 104 Ill. 206, the court admitted extrinsic evidence to determine the meaning of the following phrases: "stone for the front and footing," "full and complete satisfaction," and "finished and completed." In *Storey v. Storey,* 125 Ill. 608, 18 N.E. 329, the court stated (quoting from the *Brose* case), " 'It is always allowable to look to the interpretation the contracting parties place on their agreement, either contemporaneously or *in its performance,* for assistance in ascertaining its true meaning. No extrinsic aid can be more valuable.' " (Emphasis added.)

A review of the record in this case indicates that Castle was made a co-lessee, thus entitling him to some income from the quarry operation in lieu of receiving a fee from the owner for finding a quarry lessee. The lease itself is silent with respect to the interests of the parties. The evidence in the case clearly rebuts the presumption that they were to have equal interests. There is evidence of an agreement, first admitted and then refuted by Castle, that he would receive 2 cents per ton as his payment. Castle states that he was not in fact paid under any such agreement; Hulcher states that records were kept and Castle credited with 2 cents per ton. Castle states that he worked at the quarry over a period of 4 years for which he has received nothing; Hulcher states that Castle has been paid in full for what he has done and that his presence at the quarry was due, in part at least, to Castle's own trucking operation. Castle states that he supplied certain office equipment and other items for the enterprise for which he has not been paid; Hulcher states that part of these items were not used and that others were not requested by him.

■■ Viewing the record in this case we are not disposed to disagree with the trial court that Castle "had no interest as a partner or otherwise in the leasehold involved in this action." We believe the record shows that it was the intent of the parties that Castle's interest would be a limited one consisting of a right to a part of the royalty on the tonnage produced; that Hulcher would operate the quarry, take the risks in-

volved, pay the owner the royalties due him and otherwise be in complete charge of the quarrying enterprise. The facts bear out this interpretation of the parties' intent. Furthermore, though the evidence is controversial, we think it is reasonable to believe that Castle has been compensated in accordance with the understanding he and Hulcher had during the period of operation in question.

Affirmed.

G. MORAN, J., concurs.

Mr. JUSTICE EBERSPACHER dissenting:

By the terms of the "contract" and by virtue of section 6 of the Mines Act (Ill. Rev. Stat., ch. 94, par. 6), Castle became a cotenant with Hulcher. The preamble to the "contract" provided that Johnson, the owner, "leased and let" and "grant[ed] exclusively unto the said lessees, their heirs and assigns." Section 6 provides that:

> "Any mining right, or the right to dig for or obtain   *   *   *   or other mineral from land, may be conveyed by deed or lease, which may be acknowledged and recorded in the same manner and with like effect as deeds and leases of real estate."

The "contract" in question specifically refers to the extraction of limestone in sections: 1, 3, 5, 6, 8, and 13. And limestone is technically a mineral according to *Kinder v. La Salle County Coal Co.* (1923), 310 Ill. 126, 141 N.E. 537. In that case the Court declined to include limestone within the clause "all minerals of every description" because such an interpretation would have destroyed the grantor's reservation of rights to the surface for agriculture purposes. However, the court did concede that limestone was technically classified a mineral and without the extenuating circumstances present in *Kinder, supra,* there is little reason not to hold that the "contract" involved in this case conveyed a mineral lease within the terms of section 6.

Furthermore, it should be noted that the appellant in his complaint stated that this "contract," conveyance, was recorded on the land records of Montgomery County. The appellee in his answer admitted this recordation. All the evidence is to the effect that the parties treated the instrument as one conveying an interest in realty, until Hulcher sought to treat it otherwise when it benefited him to do so.

Where two or more persons take as tenants in common (which would be presumed under Ill. Rev. Stat., ch. 76, par. 1) under an instrument which is silent in regard to their respective shares, there is a presumption that their shares are equal. The presumption that tenants in common hold equal shares where the instrument under which they claim is silent

in that regard is not conclusive, as between the parties, and so it is subject to rebuttal *on sufficient proof*. However, as stated in *Keuper v. Unknown Heirs of Mette*, 239 Ill. 586, 88 N.E. 218, the burden of establishing that the tenants in common were not intended to share equally is upon the person attempting to overcome the presumption of equality, in this case Hulcher.

Hulcher would have us believe that not only were he and Castle to share disproportionately, but that Castle was not to take any fixed share in the lease. All that Castle, according to Hulcher's unsubstantiated, self-serving testimony, was to take, was 2 cents per ton; this is not a respective share in the lease; rather, it is a royalty. Hulcher offers no explanation of why Castle was made either a lessee or a grantee and 18 months after the instrument was executed, Hulcher acknowledged Castle as an "owner." When or by what act or by operation of what law he was divested is not disclosed by this record. Hulcher was represented by his attorney at the signing of the contract and while he may not have drafted the document it was modified at his suggestion to accommodate him. There is no evidence that Castle participated in any way in the preparation of the instrument. It is my opinion that this document should be construed against Hulcher in any case of ambiguity, and it is he who contends it is ambiguous.

Even ignoring these presumptions against Hulcher, I find insufficient proof that Hulcher and Castle were to share unequally. While Hulcher made all the payments to Johnson this does not infer that Castle would not have been liable had Hulcher not paid—the agreement between the parties made Hulcher the party to whom Johnson would look for his royalty. Section 3 of the agreement expressly provides that Hulcher and Castle were jointly and severally liable for the royalties. It is Hulcher's testimony, not Castle's, which is inconsistent. Castle never admitted any 2-cent deals and specifically denies any such deals; his testimony was consistent with the interest he claimed.

Hulcher's testimony is further weakened by a number of factors. First, the Kessen agreement is signed by Castle and Hulcher as "owners." Secondly, Hulcher testified to two separate 2-cent deals. The first deal allegedly gave Castle 2 cents a ton as a brokerage fee and the second allegedly gave Castle 2 cents "for selling and collecting rock." Thirdly, Hulcher terminated Castle's "two cent per ton levy when Castle left the quarry." This indicates that the 2-cent levy was in return for services rendered and *not* incident to ownership. And lastly, Hulcher sent no written notice of assignment as required by section 12 of the "contract." This was admitted by Hulcher who did not act "in accordance with paragraph 12 of the lease" which recognized that Castle had an interest,

which he would assign upon a proper written request. That section does not set out under what terms Castle would assign upon Hulcher's written request. It gave Hulcher no authority to assign Castle's interest. Appellee Hulcher states, "Under the terms of the lease Hulcher owned what he owned, and if Castle owned anything Hulcher's acts could not alienate or prejudice Castle's interest," citing *Fyffe v. Fyffe*, 292 Ill.App. 539, 11 N.E.2d 857. Accepting Hulcher's own statement, Hulcher could not divest Castle by means of assignment under section 12. Therefore, if a 2-cent deal existed it continued even after Hulcher formed his "corporation" and assigned his interest in the quarry to it. If it is felt that there is sufficient evidence to establish the 2-cent deal then Castle is entitled to an accounting for 2 cents a ton from the date of the "contract" until the present, *and* he is entitled to an additional 2 cents for "selling and collecting rock" pursuant to Hulcher's self-serving, unsubstantiated testimony.

In summary: Hulcher has to overcome the presumption that he and Castle were to take equally; he has to establish that the contract meant other than what it said; and he must establish the 2-cent deal was Castle's only interest. Even under ordinary standards of proof, Hulcher failed to meet his burden. And because the standard of proof is "clear and convincing evidence" the quantum of proof required is that which leaves no reasonable doubt in the mind of the trier of fact of the truth of the fact in issue. *In re Estate of Weaver* (1966), 75 Ill.App.2d 227, 220 N.E.2d 231.

Hulcher has, as a matter of law, failed to meet this burden and the finding of the trial court should be reversed as not being supported by the evidence. Even if the majority consider otherwise, the least that should be done is to remand for an accounting on Hulcher's theories that plaintiff agreed to 2 cents a ton in the nature of a royalty and the additional 2 cents a ton for "selling and collecting," and including both parties' share of the 10-cent-per-ton royalty.